EDWARD SCHICKHAUS ET AL. v. CITY OF NEWARK.

Decided October    , 1923.

Oral opinion of Chief Justice Gummere, showing the practice in relation to ordinances for public improvements and the assessments for benefits and damages on the taking of lands for such improvements under the Home Rule act.

On writ of *certiorari*.

Before GUMMERE, CHIEF JUSTICE.

For the prosecutors, *J. Henry Harrison* and *Spaulding Frazer*.

For the defendant, *Joseph G. Wolber*.

THE COURT (after argument). So far as the objections which relate to the validity of the ordinance are concerned— that is, the action of the commission in failing to send a map of the properties with the ordinance to the commissioners of assessments, and the objection that it does not properly provide for a limitation of the burden put upon property owners—that is, for assessments according to the benefits received, the objections resting upon those two phases of the case, I think, come too late. When the ordinance was passed it was either valid or invalid. If property owners desired to test them after it was up to them to act with promptness and not to sit by and speculate upon what the respective awards to them might be before determining whether or not to attack the ordinance; and that is true also with relation to the action of the board of assessments in proceeding to make an award without having the map returned with the ordinance.

The other objections, however, stand on a different basis. One of the questions, it seems to me, is whether these prosecutors, as property owners, are entitled to attack the several

awards made by the commissioners upon the theory that the appropriation provided by the ordinance is not large enough to pay them. If they get the money they are not hurt as property owners. In the cases of Hartley *v.* Trenton and the Board of Commerce *v.* Freeholders of Essex County, the question was whether, as against taxpayers, the governing body would get away with an illegal act and thereby increase the burder upon the taxpayers. In the Hartley case, as I recall it, Hartley appeared as a taxpayer, as well as a disappointed bidder for a contract. We are all familiar with the ,Chamber of Commerce case; that is a late case,' the same situation existing, the chamber of commerce claiming to be a representative organization of the city of Newark, speaking for its citizens, the taxpayers; and it was with this situation in mind that I asked whether these present applicants appeared simply because they were property owners. Mr. Harrison says that the application is made by them as taxpayers as well, and in that latter aspect I suppose they can raise these questions, just as you or I or any other taxpayer in Newark would be entitled to raise them.

Dealing with the matter of the appropriation: As I understand the situation, the commissioners of the city concluded that it would be for the advantage of the people of Newark, whose representatives they are, to acquire this land shown on this map, provided it could be acquired for some $300,000, and so they solemnly ordained that the land should be acquired, provided it could be acquired, for that figure; and upon this basis the matter went to the assessment commissioners for their ascertainment and determination as to whether or not this land could be acquired for that sum. They reported back that it could not be; that it would cost twenty-five per cent. more, approximately, than the amount with which the city commissioners thought it was advisable that the public should be burdened, *i. e.,* the amount of benefit which the public would receive by the proposed improvement. In that situation, what authority has the governing body of the city of Newark to take possession of that

land, and pay the awards therefor made by the commissioners of assessment?

Mr. Wolber—There is a law which would permit them to issue temporary loan bonds.

The Court—The law does not permit the city to issue temporary loan bonds except for the purpose of discharging a legal indebtedness; if they have not the money presently available they must raise it by the issue of temporary loan bonds; but they cannot legally issue temporary bonds to pay Tom, Dick and Harry money which those gentlemen are not entitled to have from the city. The only way, it seems to me, offhand, in which the city could meet the situation created by the return of the assessment commissioners was to pass a supplemental ordinance providing for the appropriation of this extra amount of money—that is, in the same solemn form by which they provided for the raising of the first $300,000. In that way you and I and every other taxpayer would possess information that our servants—not our autocratic governors—but our servants, contemplated, in the discharge of the duty owed to us, spending a larger sum of money for the acquisition of this property than they earlier thought was proper, thereby increasing the public burden by the additional amount. And then, I suppose, although I am not very familiar with the methods pursued in the city hall, there would have been notice of the proposed supplemental ordinance, so that the people who were interested would have an opportunity to be present and to be heard, and to satisfy the commission, if they could, that such supplemental ordinance was unwise. But that is a very different proposition from saying that the city commission, after solemnly appropriating $300,000, and then finding that they cannot buy the property for that amount, can arbitrarily issue bonds in excess of the amount appropriated without any consideration of the question whether it is to be the interest of the people whom they represent to acquire the property at the increased amount. That is not a performance of a duty imposed upon the public officials of the city of Newark. The officials of the city of Newark are governed by law; they must be. The

statute prescribed and limits their powers, and their powers are limited by the statute, as I think, to the extent I have suggested. So that I think these applicants, as taxpayers, are entitled to be heard on the question of the power of the city commission to acquire this land for the sum ascertained to be its value without taking any step which would make that acquisition legal.

On the question of the assessment of damages: The failure of the board of assessment to take into consideration the loss of business and all that kind of thing, of course, relates to. these intending prosecutors in their position as property owners; but that, as I recall the statute, is a matter that can be reviewed by a jury. If for any reason the award of the commissioners is too low because they failed to take into consideration some element that was material, the property owner has his right of review by taking an appeal and submitting the question to a twelve-man jury.

One other matter has been discussed, and that is the right of the assessment commission to base their award to any extent upon what has been called here the report of Mr. Kilgus, and a report of some other distinguished gentleman, known as a building expert. I have always supposed that where the sovereign power of eminent domain was to be exercised, and my property was going to be taken for the public good, I was entitled to be heard. Of course, the testimony of witnesses as to the value of the property is not controlling; the assessing body may go and view the property and they may use their own judgment resulting from that view in determining what the property is probably worth and what injury is done to the remaining property. They are entitled to form their judgment upon all of the facts which properly come to their knowledge. They may, as Mr. Wolber says, look at the books which show the business done on the premises and the receipts and expenses thereof, assuming that they are correct transcripts of the facts set out therein. They may take the testimony of experts. The condemning party may produce witnesses who are supposed to have expert knowledge; but these witnesses are subject to cross-examina-

tion on the part of the property owners; the property owners also may produce expert witnesses, and those witnesses are also subject to cross-examination by the condemning parties. But I never yet have heard that after all the testimony had been taken and all the facts had been produced and all of the views of experts expressed under oath, the soundness of which had been tested by cross-examination, that the commissioners could go around the corner and talk to two gentlemen in whose ability and judgment they had confidence and say, "What do you think, Mr. Expert? What do you think ought to be done by us?"

Mr. Wolber—It was while the hearing was being held.

The Court—That I think would be quite as objectionable. I am the property owner and I think I am entitled to be afforded a hearing; and that hearing includes not only the presentation of my own case, but what the other side contends. I have a right to hear the testimony, under oath, of experts (whether called by my adversary or the condemnation commissioners) as to what their view is and why they have it; and I am entitled to demonstrate, if I can, by cross-examination, the fact that their views and their conclusions of the experts rest on an unsound foundation. For instance, in the condemnation of land on the surface of the ground when the Pennsylvania Railroad Company built its tunnel, two thousand feet below the surface, they called experts to show to what extent the land on the surface would be damaged by running of trains in this tunnel nearly one-third of a mile under ground. Of course, the value of the so-called experts' testimony depended largely upon their previous experience as to what effect those conditions had upon the land on the surface; and as they did not have any knowledge at all upon the subject the court held they were not experts, although they had been in the real estate business in the vicinity for a long time; that the man on the street would be just as well qualified as an expert. I am inclined to think that these applicant were injured as property owners by the action of the assessment commissioners, which I have dis-

cussed, and that they are entitled to have it reviewed.  I think I have covered everything.

Mr. Wolber—Could I ask that the *supersedeas* phase of the writ be suspended so that there will be no delay in straightening the errors out?

The Court—The difficulty is that you are not in position to straighten yourself out.

Mr. Wolber—We could probably, with respect to the confirmation of the award, undo it and send it back.

The Court—So far as any future action of the city government is concerned, tending to correct the apparent defects which I have tried to point out, I have not any objection to its taking such steps as it may consider proper—that is, if counsel agree with my view that the objections seem sufficiently meritorious to make it proper to have the matters reviewed.  I would not be willing to-day to go any further than that—in other words, I would not be willing to say they may be permitted to override the normal stay of the writ by taking possession of this property and tearing down buildings thereon.

A branch of the Supreme Court will sit in Trenton on the 13th day of September, and I think a hearing of the matter could be arranged then and in all probability quickly disposed of.